All right, Ms. Hester, you may proceed. Thank you, Your Honor. May it please the court. Police violated Tremayne Drakeford's Fourth Amendment rights in two ways when they stopped him and searched him during a shopping trip at the car stereo warehouse. First, they seized him without probable cause or reasonable suspicion. And second, Officer Schur exceeded the permissible scope of a terrorist search for weapons when he searched Drakeford's pocket for drugs. The Supreme Court's decision in Clover and this court's decision in Brinkley make clear that police cannot ignore facts that dispel probable cause or reasonable suspicion. But here they did exactly that. Interpreting Drakeford's second handshake in front of the car stereo warehouse as a drug transaction ignores numerous facts that made the officer's and no court has found even reasonable suspicion based on similar facts. First, consider the custom of shaking hands. Detective Murphy repeatedly testified that his only reason for thinking the handshake was suspicious was that it was a second handshake and was longer than the first. But handshakes are ubiquitous and can mean many different things. Excuse me, Ms. Hester, but wasn't there more knowledge that the officers had before getting to that second handshake information from the informant that I guess they said this informant had been credible in the past? Right. So let's talk about the informant because the police were relying on an informant whose allegations of drug dealing had never predicted any of Drakeford's movements and had repeatedly failed to bear fruit during the officer's surveillance. After receiving that initial tip, once they finally figured out where Drakeford actually lived, officers watched Drakeford more than 30 times over the course of a month or more before they saw anything that even they thought was suspicious. And what's more, all their attempts to corroborate the informant's general allegations of drug dealing had turned up empty. So the first time they thought they saw something suspicious was on Thursday, February 1st, where they saw Mr. Drakeford meet in a gas station parking lot with the man in the white pickup truck. So they followed that truck and had other police officers search it, but that search came up empty. They didn't find any drugs. All they found were some syringes. Later that same week, which would have been February 2nd, 3rd, or 4th, they watched him drive to a gas station and park, but he didn't meet anyone. So that same day, they called the informant and asked the informant to make contact with him. She did. She reported he said that he didn't have any drugs. Then they watched him drive to a house, pick up a bag, and then the informant told him while Drakeford was driving home that he told her he had drugs to sell. But still, even after that event, for five days or a week after that, the officers didn't observe Drakeford engage in any conduct that they thought was a drug transaction. And perhaps most importantly, the informant never predicted any of Drakeford's movements or even told police that Drakeford was engaged in a drug transaction at a specific time and place. So even when... Yeah, I just want to clarify. The informant didn't tell them that he was going to be at this stereo warehouse that afternoon either, did he or she? No, the informant, she never predicted any of Drakeford's movements that day or any other. And they never did any controlled buys or attempted any controlled buys with this informant or anybody with this defendant? That's correct. That's correct. And even aside from the weaknesses and the informant's information, there are other things besides there's the custom of shaking hands, which as this court well knows, does not always happen at the beginning of a conversation. It can also be used to shake hands to offer congratulations or express gratitude or at the end of a conversation. Well, of course, we are familiar with the handshakes, at least in the old days. But let me ask you, do you agree that in the aggregate, even otherwise innocent conduct can give rise to a reasonable suspicion? I think that that's true, but I think it is true when you have an informant who is predicting movements that otherwise innocent movements that corroborate an informant's predictions of what the defendant is going to do can establish reasonable suspicion. But we don't have that here. But this informant is just a single piece of this puzzle. If she was the only evidence, the only source, then perhaps it sounds like they may be stronger, but there's more here than just the informant. Well, what they have besides the informant is a handshake where the officer who said that he observed that admitted that he never saw any suspicious items or money change. I'm sorry to interrupt. Judge Gregory, Judge Wynn, Judge Thacker has dropped. Ms. Hester and Ms. Ray, sorry for the interruption, but Ms. Carmichael got us on and we're ready to go. Ms. Hester, you may proceed. Okay. I think that when we dropped out before, Judge Wynn had just asked me, don't we have more than the informant's information? And I was following up to say that what we have is a handshake where Murphy didn't see anything change hands, and it's not even clear, he didn't testify that he even saw the men's hands at all. So that alone really defeats the but there's more that defeats the government's reasonable suspicion. Well, let's don't leave the handshake yet because the officer who observed that handshake testified that he had done hand-to-hand transactions himself and that the handshake he witnessed was consistent with that practice and the district court credited that testimony. Don't we have to defer to it? I think that you have to consider the totality of the circumstances, which the district court did not do. And that requires the police and this court in reviewing it to consider all of the circumstances surrounding that handshake that indicated that it was just a handshake and nothing more and not what the officer wanted it to be. Ms. Hester, what did the district court not consider? The district court didn't consider that when Murphy said that he believed it was a hand-to-hand, he also testified that people conceal what's in their hands during a hand-to-hand transaction because openly trading drugs would compromise the discretion of the act. But that is directly contrary to construing this handshake as a hand-to-hand because the men were standing right next to their cars. They could have met in broad daylight in the afternoon in front of a security camera. That's correct. And furthermore, so we have Detective Murphy who has four years of experience, but we also have Detective Moore who has 20 plus years of experience explaining that how drug deals go down in parking lots in Charlotte. And this is not how he explained drug deals go down in parking lots in Charlotte. This transaction didn't fit the police's own profile of how a drug transaction occurs. Detective Moore testified that when a drug transaction happens in a parking lot, two people meet in their cars, one gets out of their cars and into the other car and that transaction happens in the car and then the people quickly leave. But that's not what happened here, which makes this case similar to the Seventh Circuit's decision in Fausto Lopez where there was no reasonable suspicion because the defendant's movements didn't match up to an description of how he conducted drug transactions with the defendant. They were looking for Drakeford to conduct his activities in a particular way when he went to the car stereo warehouse and that actually did not happen. The government has identified no case where any court has found reasonable suspicion, much less probable cause, on similar facts. The case is most similar to the United States versus Foster where this court found no reasonable suspicion. Just as in Foster, Drakeford had a history of drug arrests and was under investigation for drug trafficking. As in Foster, the events occurred in the middle of the day in an area not known for crime and if anything, the events in Foster were more suspicious because in that case, two men were in the car together. The officer thought the men were attempting to hide something based on their movements and there were no additional facts in Foster showing innocent conduct as there are here. So under Foster, the court should conclude the officers violated Drakeford's Fourth Amendment rights when they stopped him and searched him without reasonable suspicion or probable cause. But even if officers had reasonable suspicion justifying a Terry stop-and-frisk, Officer Scherr's search of Drakeford's pocket exceeded the permissible scope of a Terry search for weapons. So in its briefing, the government doesn't dispute that squeezing or manipulating a suspect's pocket exceeds the scope of a Terry search. And in the district court, the government explicitly admitted in its briefing that the video, and I quote, shows the defendant's sweatshirt moving in a manner that is consistent with being manipulated by another person. That is at page 321 of the joint appendix. But nevertheless, the district without manipulating or lingering over any particular area. That finding is clearly erroneous. As the government conceded in the district court, the videotape from Detective Scherr's body-worn camera shows movements of Drakeford's jacket that are incompatible with any mere pat-down of the outer surface of his clothing. That movement could have happened only because Scherr- You said the government conceded that? Where did the government concede that? That's on page 321 of the joint appendix. And I apologize to the court for not including that in my briefing. I only saw that when I was rereading the joint appendix. But the government specifically says that the video shows the defendant's sweatshirt moving in a manner that is consistent with being manipulated by another person. So in your opinion, what would have been the appropriate way given the sagging shirt to conduct that first in that situation? To simply do what we see them do on videos all the time, which is to press the clothing against the body of the defendant. And that sweatshirt is so thin that if there had been a weapon, he would have been able to feel it through the exterior, the outer surfaces of the clothing, which is what Terry allows. A padding of the outer surfaces of the defendant's clothing, not a grabbing and pulling and moving underneath the hand. If the video is vague and hard to see what's happening, it's hard for me to understand what's happening there. Doesn't the deference there then go to the district court and the government? I think that if the court can't tell, if the court is not persuaded that the video conflicts with the district court's factual finding, I think that's correct. But again, the district court basically invited this court to review. It made clear its finding was what the body camera footage showed. So it made clear that it was relying on that body camera footage. So I think that if this court has a different view of what the body camera footage shows, that it's fair to say that the court can find it clearly erroneous. And also I would just say that what is clear from the video is you can see the zipper because it's bright. You can see it pulled out from the side of the defendant's body. And that movement is just flatly inconsistent with any padding of the exterior clothing, pushing it up against the body of the defendant in order to feel what's underneath. So this court has found the district court's factual finding clearly erroneous when it conflicts with objective evidence such as a video recording. So here, after reviewing the video evidence, the court should be left with the definite and firm conviction that the district court's factual finding is wrong. And that Scherr squeezed or manipulated Drakeford's clothing before reaching into his pocket, which violated Drakeford's rights under the Fourth Amendment under Terry and Sobran because he manipulated Drakeford's pocket during a search that he admitted was at least in part a search for drugs. In conclusion, police violated Drakeford's Fourth Amendment rights in two different ways when they stopped him and searched his pocket. But either one of those violations alone is enough to require suppression. Thank you. Thank you, Ms. Hester. Ms. Wray. Thank you. May it please the court, Amy Wray for the United States. Your Honors, this court should affirm the judgment of the district court because the district court properly held that reasonable suspicion, supported the pat-down of Mr. Drakeford, and the court credited the officer's testimony. Nothing in the video can overcome or does overcome the officer's testimony, two of whom said that Officer Scherr conducted a proper pat-down and did not manipulate the pocket. But Ms. Wray, before we get to the pat-down of the pocket, doesn't there have to be reasonable suspicion in the first instance to stop the appellant? Absolutely. And, Your Honor, we had more than that. I'm sorry. I didn't mean to interrupt you. What's your best evidence of reasonable suspicion in the first instance? So, the best evidence is the aggregate evidence of, first of all, Detective Murphy, who had both seen and conducted hand-to-hand transactions, said that he witnessed a hand-to-hand transaction. And the other pieces... Excuse me, Ms. Wray. That's a conclusion. What he said was he didn't see any drugs. He saw two people shake hands. You can be an expert all you want, but that doesn't make you have a conclusion that you saw anything. What you're saying is that... This case is just amazing. What you're saying is that if we believe you're a drug dealer, that means if you shake hands with anybody, you could say, well, I believe he's a drug dealer, and he shook hands, and I've seen him shake hands, have other people shake hands, and it's a drug deal. That can't be the law. It's not the law. But didn't you just say that he's seen handshakes before? He didn't see any drugs. He saw a handshake. Your Honor, he saw two handshakes. The first handshake he did not think was a hand-to-hand transaction. Okay. The second one, now wait a minute. Did he see drugs the second time? No, but this court has upheld reasonable suspicion based on hand-to-hand transactions where the officer did not see drugs. And that's all he saw in those cases where, and that was the case, that's all they saw in those cases? There was no more information, for example, in United States versus Linder than where they saw people looking in an open palm of a hand and did not see anything more than that. And the court said, yes, based on it was dark, it was late, they were suspicious of these folks. The point is that in addition to this hand-to-hand, we also had evidence, not only from an informant who had not provided information in more than 50 investigations, a number of which over 10 years, a number of which had yielded convictions and helpful assistance, but also an informant who had recently confirmed that Mr. Drakeford had received a resupply of drugs, heroin specifically. When you say recently confirmed that he'd resupply of drugs, how recently? The brief says the same day, but the record doesn't seem to bear that out. Your Honor, I agree. And that was my mistake. I would say it was within a few days, it was no more than five. And I looked back to see what I was relying on, and it was some cross-examination of Officer Moore, Detective Moore. But in any event, it was within four or five days at the most. But there was no controlled by once the informant- No, no, no. But I would respectfully say, let's bear in mind that reasonable suspicion is well less than a preponderance of the evidence, right? It's more than a hunch, but it's much less than a preponderance of the evidence. So, we have a gentleman who, and a known and reliable informant has said, he is trafficking heroin and cocaine. That informant, that's not the only information that she gave. But he didn't say, but she, I'm sorry, but the informant didn't say that this defendant was trafficking in cocaine because she didn't provide a name or an address, only a license number and a general description that could apply to a lot of people, correct? Well, it was a general description, but it happened to meet the description. It was a light-skinned black man, heavy set with a beard, and that matched Drakeford's physical description. And the license plate came back to Mr. Drakeford. He said, Mr. Drakeford is a light-skinned black person? He's lighter skinned than he's, I wouldn't characterize him, Judge Gregory, as dark-skinned. I've seen the video. I have also. And so, we're dealing with people who've said that's consistent to say he was a light-skinned black person, him. Your Honor. I mean, that turns on his head. That alone is the problem there. You're telling us that it was consistent because she said a light-skinned black person he was, and you said that's consistent. I've seen the video. Fair enough, Your Honor. Your Honor, it was, she said he was heavy set, he had a beard, he's a black man, and they traced the car's license plate back to Mr. Drakeford. They then watched Mr. Drakeford, and they saw him engage in what appeared to be a possible drug trafficking transaction in a parking lot of a gas station. They followed- What appeared to possibly be. Right, and this is, sure, and they didn't arrest him. So, that means that, yeah, yeah. So, he's a black person in a car. He's talking to somebody, so that means it appears he possibly was drugged. Is that what you just said? He engaged in activity that they believed was consistent with drug trafficking. They followed the truck. What is the activity? Pardon me? What is the activity? They saw him go into the parking lot of a QT gas station and sit there and wait, and then when a car arrived, the gentleman in the car, truck rather, white truck from the South Carolina license plates got into Mr. Drakeford's car. Forty-five seconds later, approximately, he gets back into his truck. The officers follow him, and because he's slowing down and speeding up and slowing down and speeding up, they're concerned that he's getting high. So, they have a Rock Hill, South Carolina officers pull him over. A drug dog alerts to the truck for narcotics. Now, they did not find narcotics, but they found syringes. And so, it is quite possible that he had engaged in a drug trafficking transaction and at a minimum or a deal, you know, some conversation about a future deal. The point is that it was behavior that's consistent with what the experienced officers. Right. The experienced officer said that the handshake was a drug transaction in his experience. Didn't the officer also testify, as you're arguing, that drug transactions typically take place one person getting into another vehicle and the transaction takes place there, which is what they thought happened, but apparently did not happen with the white truck. On the day that they stopped him and arrested him, nobody got into the vehicle. They were in broad in front of a business, shaking hands, and then they went into the business instead of getting into the car and driving away with what purportedly was drugs. That just seems like normal activity, particularly in light of the fact that they had not none of the times they tried to catch him before for fruit. And don't we can't ignore those facts. Your Honor, a couple of things I would respond. First of all, I don't think that the interaction with the truck necessarily did not bear fruit. The drug dog can't alert it for the presence of narcotics. But let's let's turn to the car stereo warehouse. It's important to remember one. Detective Moore did not testify that that's the only way drug transactions happen in the city of Charlotte. And we know from the videotape and from the testimony that Mr. Drakeford knew the owners of the car stereo warehouse. He was well familiar with him. In fact, he left his keys with them when he left. So this was a place that he knew the owners. He was known there and he was comfortable there. And because there were two handshakes and the second one appeared to be a handshake conducted in a particular manner, not just any handshake, a longer, more deliberate handshake, that experienced officer testified. I've done that before. I've seen that before many times. And I believe that that was a hand to hand transaction. And when we combine that with the other evidence that they had garnered over the time that he had been recently resupplied, whether it's three days, five days or the same day, he had. I've seen long handshakes, too, in public places that are not drug transactions. No doubt that I understand about the totality of the circumstances. But I'm sorry. I know. I'm sorry. When I asked you about your best evidence of reasonable suspicion in this totality of the circumstances, I think you said it was the handshake, right? The second. Let me just make clear. It is everything combined. We can't. The best evidence is the handshake plus the informant's information, plus watching him conduct. Let me ask that. Let me ask the question in a different way to you. What? When do you say that the officers develop reasonable suspicion? By the time that they I mean, you know, there's let me just say this to support this particular pat down. They developed reasonable suspicion at the time of the hand to hand transaction. So the hand to hand transaction occurred. And then that's was that at the stereo store? Yes, sir. So you got the Supreme Court case of Kansas versus Glover. You're familiar with that. Yes. And that's a case that said you can have these facts. But if you have additional facts, it can dispel the reasonable suspicion. So so when we when we look at what happened after this and they just casually walk into this stereo store, that's not consistent with someone. I mean, I'm not being argumentative. I think you frown a bit. But but follow me on this. Sure. You know, you don't conduct a drug transaction out in the open and then just casually walk in in a carefree manner into a store. That's when I mean, I don't know any officer who testified to that. I don't know. Maybe our own experiences. I'm talking about the record reflect. Nothing shows. In fact, it shows that that's rather incredulous that they would conduct this drug thing and then walk in casually in the store and everybody drugs and all of that. So why is that not at least something that might give us some pause on the Kansas versus Glover? The case came out last year for a couple of reasons. First of all, it's a hand to hand transaction. They're not they're not. It's it's something that is small. Well, you call it a hand to hand transaction because as just as chief judge has indicated, you've reached that conclusion based upon what you did. There was no drugs. There was no drug scene. What you have is a handshake, which, yes, could lead to the conclusions. My statement is if that's all happens to get in the car, you have a strong, stronger case. I'm not saying you don't have a case, but if you shake a hand, walk in, what if you go in and watch a movie or you just go in and sit out and have dinner after you have this so-called hand to hand transaction under the Kansas versus Glover? That's what I'm saying. I'm not saying that's innocent to walk into the store. I'm only saying Kansas versus Glover says if there's some additional facts that could dispel this so-called reasonable suspicion that we would ordinarily give to someone who has experience of a handshake at all, that's a handshake. But it would seem to me once you do this additional thing, you need something a little bit more than they shook hands. And by the way, how did they shake hands? Can you can you describe it again? I'm trying to understand. I kind of have an understanding of how, you know, in the normal circumstances, maybe men like this would shake hands. How did they hands? Your Honor, I want to respond. I will respond to that. I want to hear that. I want to hear that right now. I want to hear that now. I will answer that question. I'd also like to respond. No, no. But I'm going to let you do that. The the answer. Hold on a minute. Let's make sure we're on the same page. Sure. Because I like to I get confused easily in these things here. So I'm when I say what how was because you rely on his handshake a lot. How was the handshake conducted? It was a long and deliberate handshake. What does that mean? What do you mean? Was it done in a regular way of a handshake? Or was it the fingers in a certain way? Or was it a DAP, so to speak? How was it done long? It was it was distinguished from a DAP. It was a longer handshake. He does. All I can tell you is what the record reflects. No, that's all I'm asking you. Let's the facts of the handshake. I want to move move from this. I'm not trying to trick you up. I'm just asking. That's all. I'm just trying to find that fact out. That's all. Understood. How did the handshake occur? Describe hand. The handshake was long and it was deliberate and it was the second handshake that they had engaged in. OK, we understand what a handshake is, but describe what the handshake is in this instance. In other words, to use the term handshake, I'm going to have to assume I know what a handshake is. I'm asking you to describe it because you rely on it tremendously. And it shouldn't be difficult to tell me they took their fingers, they wrapped that around the palm of their hands or they did something of that nature. That has to be something, you know. Your Honor, the record reflects three things. First, that it was longer and more deliberate than the initial handshake. Second, that it occurred after right after that handshake. And third, that an experienced officer interpreted it to be a hand to hand. We don't have more than that. Let me let me let me let me make sure I understand how you answered my question. I understand what the record reflect. But do you understand you just said to me, handshake, handshake, handshake. I asked you, what is the handshake? Does that make any sense? I know the record reflects a long handshake. It reflects this. What was the handshake? Describe the handshake. How did it happen? I cannot tell you more than what the record says. And it says it was longer and more deliberate. No, if you cannot do that, then just say I don't know. That's all I want to know. Because I know what the record said. Just say I don't know. And they don't. And the record doesn't tell us. Say the record doesn't tell us or describe the handshake. Your Honor, I believe I said that. I believe what I said is what we know from the record is that it was a longer and more deliberate handshake than the first. You are not answering my question and I don't want to be argumentative on it, but I'm going to get this point. I'm going to make sure we we are together on this point. So listen to me carefully. I'm not asking you about what the record says in terms of the use of the word handshake. I'm asking you, and it's either yes or no, does the record describe the nature of what constituted a handshake? No, not beyond what I've described. And I am sorry, Your Honor. I don't need the extra. All I needed was no. You don't have to explain it. I can figure out you didn't do it beyond what you described. Just say no, it doesn't do it. And that doesn't mean anything. It just says, no, it didn't describe the handshake. That's all. Other than what the officer concluded that it was the type of handshake that he was familiar with that would indicate this. I got that. But to tell us, but we don't have information of how this handshake was done. If it's an important handshake, this is a very, this is one of the great handshakes. It's a handshake to send this guy away for years, which I'm, you know, I mean, that may be well and good, but I just wanted to know, it would seem to me that even the course of a trial, if someone relied heavily on a handshake, they would describe the handshake. They might even have them come up and describe to the jury what the handshake looked like, and then give a statement of this is how they did it. And this is what happened. Because this officer with all of his vast experience, you know, he's seen drug to drug transaction, but you know what? We've seen people exchange stuff secretly in hands too. It doesn't have to be drugs. You can exchange something secret. You don't want someone to see. That's the same kind of knowledge here. There's nothing special about the drugs, except you don't want someone to see it. And that might give him some specialized knowledge. Okay. I've seen it with drugs, but any one of us, any layman out there may have, can probably testify you too. You've seen people exchange stuff in a handshake. You may have done it yourself where you weren't trying to show what you were actually exchanging. I've done it. I mean, I've given money to people, you know, my family members, and I didn't want everybody to see it. So I took the money, put it upon my hand, and it wasn't a long one, but it was enough for them to know, and they received it. So that's what we have here seems to me as the primary evidence. And I only asked what was described the handshake itself. Your answer is the record doesn't reflect that. Thank you. If I may, I don't want to thank you. I want you to move forward, but I don't want this. I don't want a thank you for something. I would love to move forward. Okay. If you can be quiet, I'm going to let you move forward, but understand what I'm saying, because I want our answers. What I want you to understand is that when I'm asking, are we okay? I'm not beating up on you. I hope I'm not beating up on you at all. I'm good, Judge Nguyen. I'm just waiting to be able to respond to your clever question. You will be able to respond, but you will not stop talking. All I'm saying is, I asked a very simple question. Don't anticipate where I'm going. I wasn't against you on that question. I was simply asking, how was the handshake done? And all I kept getting was a circular answer of what the officer knew and all of that. So, that's where we are. And when we get to the word no, then no, let's proceed. But we don't need extra conversation. Thank you and all of this other stuff. You see what I'm saying? So, let's go forward. Go forward. Just go forward. Just go forward. Okay. Thank you. So, I'd like to respond to, and I see that my time is up. So, if I may. Yeah, you may. You may. You may. Thank you, Your Honor. I'd like to say that we're not relying only on the handshake. And I think our brief sets out the other evidence that we are relying upon. To respond to Your Honor's question about Glover and the fact that these gentlemen walked into the car stereo warehouse, I would respectfully suggest that if they conducted a hand-to-hand transaction, and I note that Mr. Anthony, they found a small amount of narcotics in his pocket. That's reflected on the video. So, if they knew each other, and all they did was get a little bit, something very small, he puts it in his pocket. There's nothing inconsistent with going into a store where they know the owners, where they're friendly, and spending a few minutes in the store. That, in my opinion, in my judgment, and I think it's fair for the district court to judge, that that would not take away at all. I live in an urban neighborhood in Asheville. It wouldn't surprise me at all for a hand-to-hand transaction to occur and for the gentleman to walk into the corner store right near where the transaction occurred, across the street from my house. So, I'm not saying that it couldn't happen. I just don't think it detracts from the value of an experienced officer who testified. I have done these. I have witnessed them. This court has considered, as have other circuit courts. Oh, Judge Thacker, I'm sorry I didn't see you. Chief Judge Gregory, can I have one question? And over time. Absolutely. Absolutely. My apologies for taking up so much of your time on this right here. And I didn't mean to do that. It just seemed to have gone that way. And Ms. Ray, I did not mean to throw you off on it, but I wanted to get a direct answer. And it was being very difficult, maybe because of our skill at knowing that we work with each other many times on these things. So, but please. If I may, I would like to at least say that I was actually trying to answer your question to say that. Well, I believe you were. I think you were trying. It's just you may not have understood my question correctly. And that's why it took me such a time to be able to articulate my question. I'm not sure you understand it right now, but I'm clear with the answer though. All right. So, Ms. Ray, opposing counsel said that the government has cited to no case in any court with similar facts to this one. And also that our foster case is applicable and goes against the government. So, what is your best case to support reasonable suspicion here? I think that Lender is a good example of a case. And I've cited that in my brief. It was a published decision by this court in 1993. And what happened in that case was that they saw a group of men in a fast food parking lot in a dark area. All they could see was that they were looking into an open palm. And that was enough to support reasonable suspicion. Now, you know, I might have looked at that and thought they could have been looking at an interesting insect. Who knows? But this court found that that was enough to support the district court's finding of reasonable suspicion. And the thing about foster is, and the reason that foster is not particularly helpful, I think, to Mr. Drakeford is that in foster, they didn't see any kind of transaction that the officers recognized as a hand-to-hand transaction or something that looked like drug trafficking. All they saw was movement of an arm above an elbow and somebody had been, the passenger of the car wasn't immediately visible. They also weren't aware exactly of the fact that, of what Mr. Foster's criminal history was here. In this case, Detective Moore was well aware that Mr. Drakeford had both been arrested and had been convicted of drug-related offenses, a number of them, not just one or two. We didn't have that information in foster. We also in foster didn't have an informant that had told us that Mr. Foster had been engaged in drug trafficking. We hadn't followed up with surveillance that showed him engaging in behavior consistent with drug trafficking. We didn't know that he had just visited a home and gotten resupplied with heroin. So all of those facts that are present in this case distinguish this case from foster and make it stronger than foster. And in fact, I would argue, make it much stronger than lender. Mr. Drakeford, the problem is that what you said was part of your panoply of pre-knowledge in the truck situation. You didn't see any hand-to-hand contact in the truck, did you? Your Honor, it happened in a car. So no, Your Honor. What? I don't mean in a truck, but in a car, did you? But foster, that was, why is that different? That means that that shouldn't count then, right? No, no, that fact, I'm sorry, Your Honor, that fact is the same. So it's true that both in foster and in this case, leading up to it, they didn't see the drugs or even in this case during the hand-to-hand, they didn't see the money or the drugs. But that's true in a lot of hand-to-hand transactions. And here, you have an informant who hasn't proven to be reliable about anything. Because you didn't find any drugs at all. You didn't find any drugs. We found drugs after we patted Mr. Drakeford down. No, no, no, no, no, no. I'm not talking about this. I'm talking about prior. You judge the informant prior, not after, because otherwise it's a self-fulfilling prophecy. Oh, they were right, you see? You can't backtrack that. She hasn't given you anything that panned out. Well, Your Honor, with all due respect, she gave us the identity of Mr. Drakeford, and then we followed him and saw him engage in activity that appeared consistent with drug trafficking, including going into a gas station and sitting there and waiting and nobody arrives and so he leaves. And so they see conduct that is consistent. They see him go into a house with a car with Florida plates and come back out about a half hour, 45 minutes later carrying a bag. And then on that very same trot, well, before the officers even got back to the station house or wherever they were going after surveillance, the informant calls and says, hey, Drakeford just called me and he's been resupplied. So that is corroboration. That is corroboration. What it is is that that's innocent conduct that once you decide someone you believe is a drug dealer, then everything they do, you would say he got on, he used the payphone and called somebody up. That's consistent, wouldn't you? Only if experienced officers testified that using a payphone at a particular time and in a particular way was consistent with drug trafficking. You have to have the officers say, this is consistent. Well, this is consistent. Well, for example, the problem is that when you talk about that, you can so easily target neighborhoods. You know, with officers, they can say, I'm in this public housing section. It's consistent with my experience that people sell drugs here. Do you think that that happens? Absolutely. And do you think that people in those areas shake hands with each other? Sure. All right. Then that would mean that if someone told you that, you know, you stand in the area, they're shaking hands. Therefore, that's because they normally shake hands when they do drugs, right? Wouldn't that be the connection you have? No, your honor, you'd have to have a lot more than that. Oh, really? You have an expert, you have a conform, somebody who's a informant who hasn't paid. The only thing you said it panned out to is that the behavior is consistent with drugs, which is sitting in a parking lot. Well, I go to the grocery store all the time. I can't recall an occasion where I don't see people sitting in the car and don't immediately get out. I see people get in the car sometimes. If you are of a mind that I'm in a place with drugs, that's consistent. But if you're in a place where you and your suburban neighborhood, not you personally, then that's okay. They're ready to meet someone. Well, that's just their friend. They're just talking. What neighborhood we had a case that came out of Richmond and Fourth Circuit had that in a sense, but I see where you're following. Your honor, I think, right. I mean, I think that the distinction is that number one, we're not asking this court to find reasonable suspicion based only on the hand to hand. It includes the other behavior, which includes a short transaction in a gas station parking lot with a gentleman who drove off, had syringes in a car and the current canine alerted and they were concerned that he had gotten high along the way. We have much more than simply the hand to hand, but it is important that this court has upheld reasonable suspicion. And I just have to, the last thing I want to say is to remind the court what you already know, but I'm going to have to say it, which is reasonable suspicion does not require that it be more likely than not that that handshake was a hand to hand. It doesn't have to have been more likely than not true. That allows you then with the handshake to go to his car, make him get out of his car, put him back, take him from there, which is required to do, put his hands on the back and then go into his pocket. Well, if you pat him down and you feel what you know immediately is narcotics after you have not only the hand to hand that you believe you've seen having conducted them, but all of the rest of the information that they had. Well, you can see that he went into his No, sir. Absolutely not. I've seen the video. I've seen the video. You can see him manipulating the pocket before the officer says after they I've seen a video a couple of times after he puts him in handcuffs. The officer said, should we do the pat down now? He says, yes, he's already been in his pocket. Your honor. The officer said, I asked him that question because I asked because to finish the pat down. When you see the zipper fly up, he has touched on the outside and that's what he testified to. But that was not a pat down, was it? He wasn't patting down because that was a loose hanging place. If you had a weapon in there, my goodness, it would have weighted it down. It was a lightweight thing that was open. It wasn't even zipped, was it? It was not zipped. And in the process of in the process of touching his outside of his pocket, he didn't have a weapon as it turned out. But in the process of touching the pocket on the outside, they both testified that he conducted a brief pat down of the pocket felt and he testified he was more than 90 percent sure that it was narcotics when he touched it. The real question is whether the video can overcome the district court's credibility determination that officers Detective Sir and Heppner were telling the truth when they said that he touched him first before he pulled out and that he felt conducted a proper pat down. And I don't believe that there's anything that you can see in that video that would say that those officers were lying about that. And so, you know, you don't have to show that he's lying. The point was the point is sure that he's touched. You can see him touching the pocket. And it is. Yeah. And it is. Is it not a type where you spanking type touching? Correct. You know what I mean? Right now, that is not. Is it? Is it? No, I mean, it's it's an unzipped, very loose jacket, which you can see, obviously, on the you know, on the it's obvious on the on the video. But he had to touch it. And if you're going to touch a jacket that loose, it's likely that it's going to move. Also, he may have gone under and searched for weapons at the waistband. I don't know which would have caused that to lift up. The point is that they both testified that he did not manipulate the pocket, that he did not go into it until after he conducted a brief pat down of the outside of that pocket, which they were concerned about because he kind of continually put his hand in that pocket or over that area. And there's nothing in that video that I would I would respectfully suggest could cause this court to hold that the district court's credibility finding was clearly erroneous. Well, the point is, you don't need to get that without question. That's correct. If this court holds, there's no one question I'm curious about. And that is if this officer was on his first day of job, he had none of this experience. Would this case go the other way? That would be up to the district court as to whether or not to credit it. I don't know. But the reason I bring it up is because there's so much testimony on the experience of the officer, particularly with the handshake. If the officer does not have that experience, then it's just a handshake. Right. I think that I mean, I think that's probably true, Your Honor. So an officer who was on his first day. So it really depends of evidence in a case depends on the experience of an officer and the testimony that they understand. They actually become experts, I suppose, to some degree. That's exactly what the Supreme Court has recognized. I understand what the Supreme Court has recognized, but I want to get to the truth of the matter, because what the Supreme Court often recognizes in a case like this, you only need to say you did it or that you have the experience and you know it. And even though I don't think the Supreme Court ever said saying alone makes anybody an expert, you can't get up and say I'm a chemist and you don't really have that background. But it's an interesting, I was just curious as to does it depend, does this case depend on the fact that these officers were so-called more experienced and had this experience as opposed to an officer who did not have it? And it seems to me, it does turn very strongly on that. I think that's a powerful part of our evidence. Okay, thank you. That's helpful. Your Honors, if there are no further questions, I've well exceeded my time and we would respectfully request that the Court affirm the judgment of the District Court. Thank you. Thank you, Ms. Wray. Ms. Hester, you have some time reserved. Thank you, Judge Gregory. I'd like to make a point about this second issue to start, and that's the government repeatedly calls this a credibility determination by the District Court, but actually the finding the District Court made was what the body camera footage shows. And that's on page 296 of the Joint Appendix. And I think that that is significantly different from the Court making its determination based on whether it thought the officers were credible or not. My second point with this is- Before you go there, I don't want to beat this, but I'm puzzled about this handshake and that an officer can testify, as Ms. Reyes indicated, the record. She pointed out three things on the records. And all they said in both instances, it was a long handshake. It was this, in my experience. But at any time, was the handshake ever demonstrated or described? Yeah. Or do we just assume everybody knows what a handshake is and then everybody knows or accepts that an officer can know when a handshake is more than just a mere handshake? I'm trying to understand that. It would seem to me that if you wanted to rely upon a handshake, you would call, you would say to the officer, would you demonstrate to us the way the handshake was done? And then once it's done, maybe for the court to describe. Your Honor, he's placed his hands in this manner. There seems to be, there was a manipulation in this manner and it does, was consistent with someone who was making a transfer. Other than, because I get it what the Supreme Court and others are saying, but even though the courts may say it, you can go with something wrong forever. You can start out and say it because no one has ever asked the question. And you wonder, how is it that a handshake that an officer can say it was a long handshake? And in various cultures, handshakes, that's why I'm not trying to ascribe anything to these young men. I don't know them. I don't know anything about it, but I do know that young people shake hands very differently than I do. And my generation shakes differently. It's not all the way, the way we do it when we come down to court. It makes me wonder if we walk down from the bench and shake hands, if I hold your hand a little long, does that, is that indicative of something that would be consistent that something could have been exchanged? But I might, I don't want to make a big deal out of it, but it seems like to me, it's a simple thing to just describe the handshake rather than say it was a long handshake or I know what a handshake. You just saying the word over and over, but you haven't told me yet. What is a handshake? Was it done? That was not done. And it may be because the detective wasn't able to see their hands because he never testified either that he could see their hands. That's a whole different ballgame. You just added on this. You're telling me the record indicates that the officer testified he did not actually see the hands. No, he never testified that he could see the hands is what I'm saying. So not only did he not describe the handshake, he never even said that he could see their hands. What did he say? He just said that he saw a handshake. That's all that he said, that he saw a second hand. You have to assume he saw the hands. I mean, if you think the defense counselor does have some duty there to say, if he didn't think he saw at that point, most people are going to say, if he saw a handshake, he saw the hands. So I'm not following that point. Mr. Drakeford wasn't represented at the time, Your Honor. He was proceeding pro se. So there was not a great deal of cross-examination. It was not a good idea on his part then. Yeah. Perhaps not. That doesn't help him here. But the officer was part, there was an entire lot between him and the car stereo warehouse. So whether, you know. Well, I'll leave it there. Officers, I think he said he had a clear line of sight. I don't want to beat that point. My point has to do with the nature of the handshake that's being so relied upon here based upon the officer's experience. And he does have experience, but he's no better than anybody else when it comes to, you know, describing him. He's got, you know, nearly everybody, that's my point. Nearly everybody has seen someone exchange something in their hands in a secretive way, whether it's not drugs or whatever, just money or whatever, you know, for a legal purpose. It just could be for fun or whatever. But that's a common experience. But I'll move on from that. I think Ms. Hester, I think that just very briefly in terms of the handshake here, he said, I saw a handshake. And as Judge Wendt says, a handshake is a handshake. Everybody knows what a handshake is. Unlike cases where they said, I saw their hands and looked like they exchanged something. That's not the evidence here. In other words, you could say something, well, I didn't see what they exchanged, but it looked like they exchanged something. Here, it says it was a handshake. That was it. That's it. And the officer actually did expressly say that he did not see anything change hands. If I could just make one final remark, and that is that I think the danger of attributing this much value to a police officer's experience is that by doing that, you avoid what Glover requires, which is to consider the totality of the circumstances, including all of the information that undermines that reasonable suspicion. Well, what it means is that it means that guilt is determined upon the experience of the officer and how to conduct an investigation. But I guess that goes to credibility. I mean, again, the court cases are going that way, but it doesn't mean that we don't go back and understand, wait a minute, what are we seeing here? Sometimes we do stuff, we don't figure out what we're seeing. And should it be that a new officer comes on, cannot convict us, get many people convicted as someone who's more experienced? And maybe so. But at least let's recognize that's what we are doing here. Right. And also recognize the officer's testimony that the reason that people exchange drugs in a handshake is to hide the act. But in doing that, he ignores all of the evidence that these two men had much easier ways to hide their act than by having a public handshake in front of the store because their cars were parked right there. Wow. All right. Thank you so much. Thank you. Ms. Hester, Ms. Ray, thank you so much for your arguments. Well done on both sides. You're both excellent attorneys and you certainly showed that skill and ability here today. And I apologize that we can't come down and shake your hands, but know please that we nonetheless appreciate your argument and we ask and hope and pray that you will be safe and stay well. Thank you. Thank you, your honor. Thank you.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker